*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSHUA BOWMAN,

        Defendant-Appellant.

UNPUBLISHED
April 16, 2019

No. 339086
Wayne Circuit Court
LC No. 16-007980-01-FC

Before: BORRELLO, P.J., and SWARTZLE and CAMERON, JJ.

PER CURIAM.

Defendant, Joshua Bowman, appeals as of right his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b), second-degree home invasion, MCL 750.110a(3), felon in possession of a firearm (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The convictions arose out of defendant's second jury trial, his first having ended in a mistrial. The trial court sentenced defendant to life imprisonment without the possibility of parole for the felony-murder conviction, 9 to 15 years' imprisonment for the second-degree home invasion conviction, three to five years' imprisonment for the felon-in-possession conviction, and two years' imprisonment for the felony-firearm conviction, with the sentence for the felony-firearm conviction to be served consecutively to and preceding the sentences on the other convictions. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Defendant's convictions arise from the shooting death of 28-year-old Terrell Baynham, which occurred in his Detroit home on June 15, 2016. Baynham, who was a drug dealer, had known defendant since childhood. The prosecution's theory of the case was that defendant and another man, Antonio Stevenson, entered Baynham's house without permission intending to steal narcotics and other items while the Baynham was away, and either defendant or Stevenson used defendant's gun to fatally shoot Baynham when Baynham returned home unexpectedly. The defense theory of the case was that (1) defendant and Baynham were friends, (2) defendant was visiting Baynham in the hours before his death and had implied permission to be in

Baynham's home while he was gone, (3) defendant was "merely present" when Stevenson "snatched" defendant's gun away from him and fatally shot Baynham, and (4) defendant did nothing to aid or abet Stevenson in Baynham's murder or the subsequent theft of Baynham's property.

At trial, Kaila Perkins testified that she and her cousin Makeia Watkins went to Baynham's house at approximately 12:45 a.m. on June 15, 2016, to hang out with him. Perkins and Baynham were close friends. Perkins and Watkins had been drinking that night and brought more alcohol with them to continue drinking at Baynham's house. When they arrived, Baynham was sitting in his orange Camaro, which was parked across the street from his home. Defendant and Stevenson were standing outside the Camaro, and defendant's black pickup truck was parked in front of Baynham's house. Perkins parked her car behind defendant's truck. She had not met defendant or Stevenson before. Perkins and defendant engaged in conversation while Baynham walked Watkins into his house so she could use the restroom.

When Watkins returned, she and Perkins walked to the corner, which was only a few steps away, to discuss their "next steps" for the night. Perkins and Watkins both testified that when they returned to Perkins's car, Watkins's cell phone was missing. The phone had been on the roof of Perkins's car when Watkins went into Baynham's house to use the restroom. Perkins testified that she assumed that either Baynham or defendant had taken the phone since they were next to her car. She told Baynham that the phone was missing, and she then noticed defendant "fumbling around the front seat of his car as if he was looking for something." Concluding that defendant must have taken the phone, Perkins threatened to "tear up" or "ram" defendant's truck if the phone was not returned. Baynham called defendant over to the Camaro, and the two men spoke privately for a moment. Then Baynham called Perkins over to the Camaro, and Baynham retrieved Watkins's phone from a cup holder in the Camaro and gave it to Perkins. Perkins became "upset" and screamed, "You're hanging around these bums stealing iPhones." Perkins and Watkins left because Perkins did not want to be around anybody that she "couldn't be comfortable with."

Perkins testified that when she and Watkins left, it was approximately 1:20 a.m. After realizing that it was too late to make it to a bar, they went to a liquor store to "grab[] another bottle." Perkins called Baynham that she and Watkins would return to his house if he "made those guys leave." Baynham agreed to "make that happen." Perkins and Watkins arrived back at Baynham's house by approximately 1:50 or 2:00 a.m., but defendant and Stevenson were still there. Baynham walked out into the road and got into Perkins's car, telling her to drive around for a little while and that if she did so, defendant and Stevenson would leave. Perkins was unaware whether Baynham ever actually instructed defendant and Stevenson to leave. After driving around for 15 or 20 minutes, Perkins drove by Baynham's house again. Defendant and Stevenson were still there, leaning against defendant's truck. Baynham instructed Perkins to keep driving.

At that point, Perkins received a call from a friend, and she then drove to Romulus, along with Watkins and Baynham, to pick up her friend. Perkins testified that when Baynham realized that Perkins was planning to leave Detroit, he told her "that he wasn't prepared to just leave" and "that he had left his main door open," locking only the exterior screen door. Perkins assured him that she would bring him "right back" home. When they returned to Baynham's house, it was

approximately between 3:30 and 4:00 a.m. Perkins testified that she saw defendant's truck in the same place outside the house, but she did not see defendant or Stevenson. Baynham's Camaro was also still parked in the street. Perkins dropped Baynham off and drove away before he entered the house. According to Perkins, Watkins called Baynham at approximately 4:45 or 4:50 a.m., but he did not answer. However, Watkins testified that she recalled making a written statement to the Detroit Police in which she indicated that she called Baynham at 4:47 a.m. that morning to see if he was okay, and he replied, "Yes."

Baynham was found dead inside his house by several of his family members at some point after 5:00 p.m. that same day. When his family members found him, Baynham was already cold to the touch. He had been shot twice: once in the back of the head and once in the side of the neck. Baynham's sister, Saporaw Cok, testified that she noticed that Baynham's Camaro, his keys to the Camaro, his cell phone, and his flat-screen television were all missing. Cok further testified that when the police arrived, an officer asked her if there was "anybody your brother had a beef with" and "[d]id your brother have any problems with anyone?" Cok responded that Baynham "never had a beef with no one, but I know [defendant] is a person that [Baynham] had a beef with." Cok explained during her trial testimony that both she and Baynham were friends with defendant and that there was a time when Baynham and defendant were not speaking to each other.[1]

Henton Ellis, who was married to defendant's grandmother and had known defendant since he was an infant, testified that defendant and defendant's daughter lived with Ellis at times. Defendant had his own room at Ellis's house. Ellis further testified that on June 16, 2016, he saw defendant carrying a flat-screen television. Ellis had never seen this television before. Ellis had also seen defendant with a gun about a month before the murder.

Officer Michael Crosby was the officer in charge of the case. Upon being informed that Baynham's Camaro was missing, Crosby learned that it was a rental vehicle that was equipped with a GPS device. Using the GPS to locate the Camaro, the police discovered it in Stevenson's possession. When they attempted to detain Stevenson, he fled and "tossed a weapon." Stevenson was apprehended, and it was later determined that the gun that Stevenson had "tossed" could not have been the murder weapon in this case.

Baynham's girlfriend, Jon Nae Gladden, testified that on July 7, 2016,[2] she received a text message that read, "Stop talking to people." Gladden did not recognize the sender's cellular number and had never received a text message from that number before, so she responded, "Who is this?" In response, Gladden received a message stating, "You got niggas out here speaking on my name." She replied, "I doubt it. Who is this?" The unknown sender responded, "It's Zig. Mothafuckas saying you keep bringing my name up." Gladden knew defendant "through the

---

[1] It is unclear from Cok's testimony when this occurred or whether Baynham and defendant were on speaking terms at the time of the murder.

[2] Gladden testified that the following exchange of text messages began late in the evening on July 7, 2016, but extended into the early morning hours of July 8, 2016.

neighborhood" and knew that he went by the nickname "Ziggy." As a result, she concluded that defendant was the person sending the text messages to her. Gladden sent another responsive text message to the unfamiliar number that she now associated with defendant, telling him to call her. They spoke briefly on the phone, but defendant said that he could not talk. Gladden recognized the voice on the phone as defendant's. They continued to exchange text messages. Gladden received a message from the same number stating, "Do people know that I did it?" She responded, "Why though?" She received a reply asking, "Why what?" Gladden replied, "Why are people saying that you did it?" In response, she received a message stating, "You tell me." Gladden received another message that said, "Just know if I go down, you're going down too." She replied, "[W]hat the if you can [sic] are you talking about?" Gladden received another text message from the same number stating, "Are you trying to set me up like you did your nigga 'Low?" She did not respond. Gladden testified that "Low" was a nickname for Baynham.

Baynham's cousin, Emunah Evans, testified that she knew defendant through mutual friends and that at some point after Baynham's murder, defendant "reached out" to her and informed her that he "wasn't there" when Baynham was killed. However, Evans confronted defendant again after hearing his name mentioned at Stevenson's preliminary hearing. Evans testified that after telling defendant what had happened in court at the hearing,[3] defendant responded by telling her, "That's not what happened" and that he "didn't kill [Baynham]." According to Evans, defendant told her that he and Stevenson had gone to Baynham's house to "buy some work," which Evans explained meant "drugs." Evans further testified that defendant told her that Baynham was "acting like he ain't want them there," that "two girls had pulled up," and that one of the girls accused defendant of stealing a phone. Defendant explained that Baynham had actually hidden the phone. Defendant told Evans that Baynham then left with the girls without informing defendant or Stevenson and that Baynham never responded to defendant's subsequent attempts to call and text him. After waiting for about 45 minutes, defendant and Stevenson decided to go into the house. Evans testified that defendant told her that he "didn't want to steal nothing" and that he "was going to leave the money there." While he was in the house "looking for stuff," defendant "heard someone coming in through the front

---

[3] As will be explained in more detail later in this opinion, the trial court sustained defense counsel's hearsay based objection to the introduction of any testimony concerning exactly what Stevenson said at his preliminary examination. The objection immediately followed Evans's testimony that defendant told her before Stevenson's preliminary examination that "[defendant] wasn't there" when Baynham was shot but that after the preliminary examination, she told defendant that she "went to the preliminary hearing, and that Antonio Stevenson had said that he was." After hearing arguments from the attorneys, the trial court ruled that it was permissible for Evans to testify that she "relayed information" to defendant about what happened at the preliminary examination but that Evans could not "say specifically what was said at the preliminary examination." The trial court's ruling and the attorney's respective arguments on the matter were made outside the presence of the jury and Evans. Following the trial court's ruling, Evans testified that she had told defendant about what had happened at the preliminary examination, but she did not testify about the substance of what was actually said at that proceeding.

door." Defendant told Evans that he hid in the bathroom but came out after he "heard some commotion going on in the front room." Defendant saw Stevenson and Baynham "exchanging words." Evans testified that defendant told her that Stevenson "snatched the gun out of his hand" and shot Baynham twice. Defendant did not say why he had a gun or why he had pulled it out. Defendant claimed that he did nothing while Stevenson went through Baynham's pockets and took Baynham's cell phone and keys. The two men fled out the front door of the house, and defendant gave Baynham's cell phone to someone in a gold Impala that was parked outside the house. Defendant left the scene in his truck, and Stevenson left in Baynham's Camaro. According to Evans, defendant maintained that nothing was stolen from the house.

At the conclusion of defendant's trial, the jury found him guilty of first-degree felony murder, second-degree home invasion, felon-in-possession,[4] and felony-firearm. Further facts necessary to our resolution of the issues raised on appeal will be discussed in the analysis section below.

## II. ANALYSIS

On appeal, defendant raises numerous claims of error. We analyze each in turn.

## A. CONFRONTATION CLAUSE

Defendant first argues that his right to confrontation was violated because statements made by Stevenson were admitted into evidence even though Stevenson did not testify at trial and was not subject to cross-examination by defendant. Defendant's argument is predicated on the testimony of two witnesses given on direct examination by the prosecutor, as well as a portion of the prosecutor's closing argument.

First, defendant cites the following exchange that occurred between the prosecutor and Evans concerning Stevenson's preliminary examination:

> [*Prosecutor*]: So when you spoke to [defendant] prior to the hearing, he didn't say anything about the death of Terrell Baynham?
>
> [*Evans*]: No. He said he wasn't there.
>
> [*Prosecutor*]: But once you heard the information at the hearing, you confronted him again?
>
> [*Evans*]: Yes.
>
> [*Prosecutor*]: And what did you tell him?

---

[4] Defendant stipulated at trial that he had previously been convicted of a felony and was ineligible to carry a firearm in Michigan on the night that Baynham was killed.

-5-

[*Evans*]: I told him I went to the preliminary hearing, and that Antonio Stevenson had said that he was.

[*Defense Counsel*]: Objection to what Antonio Stevenson said.

[*Evans*]: And—

*The Court*: Hold on.

[*Defense Counsel*]: It's hearsay.

The trial court dismissed the jury and Evans from the court room and heard arguments from defense counsel and the prosecutor regarding the hearsay objection. Defense counsel argued that Evans was "testifying to what she heard someone else say out of this court, and it's definitely for the truth of the matter asserted." The trial court sustained the objection. The court ruled that Evans could testify that she "relayed information to [defendant] about what happened at the preliminary exam" but could not say "what she heard at the preliminary exam and what Stevenson said." Following this ruling, the jury was brought back into the courtroom and Evans testified regarding the statements defendant made to her about the events surrounding Baynham's death. We have already described the substance of this testimony earlier in this opinion. As specifically relevant to defendant's appellate Confrontation Clause challenge, Evans began this portion of her testimony as follows:

[*Prosecutor*]: So after speaking to the defendant, did you tell him anything about what had happened in court?

[*Evans*]: Yes, I did.

[*Prosecutor*]: And after you told the defendant what had happened in court, did he say anything to you?

[*Evans*]: Yes. He told me—

[*Prosecutor*]: What did he tell you?

[*Evans*]: "That's not what happened."

[*Prosecutor*]: What did he tell you, the defendant?

[*Evans*]: He didn't kill [Baynham].

[*Prosecutor*]: Pardon?

[*Evans*]: He didn't kill [Baynham].

Second, defendant cites the following exchange from Crosby's testimony, during which the prosecutor was asking Crosby about the police apprehension of Stevenson when he was located in possession of Baynham's Camaro:

[*Prosecutor*]: And how were you able to locate that car?

[*Crosby*]: Well, the vehicle was—it was a rental vehicle. So we went to the rental company. They told us that it has a GPS on it. And we went up on the GPS, found the vehicle, and did a surveillance on the vehicle until someone got to the vehicle.

[*Prosecutor*]: And were you able to, when someone got into the vehicle, was that person ever—were they able to detain that person?

[*Crosby*]: Yes.

[*Prosecutor*]: Who was that person?

[*Crosby*]: Antonio Stevenson.

\* \* \*

[*Prosecutor*]: Did you speak to Mr. Stevenson?

[*Crosby*]: Yes.

[*Prosecutor*]: After speaking to Mr. Stevenson, did you develop a second suspect in this case?

[*Crosby*]: I did.

[*Prosecutor*]: And who was that?

[*Defense Counsel*]: Well, I'm going to object. I'm going to object based on hearsay. The question is intended to elicit hearsay as to what Mr. Stevenson said. So I'm going to object based on hearsay.

[*Prosecutor*]: It's not hearsay. It's an identification. It's the name of a person. It's a statement.

*The Court*: Counsel, approach, please.

[Discussion held off the record]

*The Court*: As long as he's not stating exactly what Mr. Stevenson said, you can ask him based on his conversation where did he go from there.

[*Prosecutor*]: You said you spoke to the defendant or the suspect, Mr. Stevenson; is that correct?

[*Crosby*]: Yes.

[*Prosecutor*]: And after you spoke to Mr. Stevenson, did you develop a second suspect in the case?

[*Crosby*]: Yes.

[*Prosecutor*]: And what was the name of that person?

[*Crosby*]: [Defendant.]

Third, defendant refers to the following portion of the prosecutor's rebuttal argument during closing arguments:

They knew who these people were the day after. Stevenson was caught in the car. *Stevenson talked.* They did a lineup. The Defendant, Bowman, was picked out of the lineup. They knew who these people were. They just needed some more time to develop a case. [Emphasis added.]

No objection was made to this argument. Stevenson did not testify at defendant's trial.

Because defendant did not raise his Confrontation Clause challenge in the trial court, this issue is unpreserved for appellate review. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Although defense counsel objected to testimony of Evans and Crosby with respect to statements of Stevenson, defense counsel only objected on hearsay grounds. We note that defense counsel's hearsay objections were successful. Nonetheless, these objections on hearsay grounds do not operate to preserve defendant's Confrontation Clause issue. *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993) ("An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground.").

We review unpreserved claims of error predicated on the Confrontation Clause for plain error affecting substantial rights. *People v Walker*, 273 Mich App 56, 66; 728 NW2d 902 (2006); see also *Delaware v Van Arsdall*, 475 US 673, 682-684; 106 S Ct 1431; 89 L Ed 2d 674 (1986) (holding that harmless-error analysis is generally applicable in the context of Confrontation Clause errors); *People v Buie*, 285 Mich App 401, 407; 775 NW2d 817 (2009) (noting that a violation of the Confrontation Clause was not a structural error and that this Court "review[s] unpreserved claims of nonstructural, constitutional error for plain error"). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "A 'clear or obvious' error under the second prong is one that is not 'subject to reasonable dispute.' " *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted). Under the third requirement, a defendant must generally show "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763.

The Confrontation Clause of the Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . " US Const, Am VI. This right has been made applicable to the states. *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004), citing *Pointer v Texas*, 380 US 400, 406; 85 S Ct 1065; 13 L Ed 2d 923 (1965). The

right of confrontation is also protected by the analogous provision of the Michigan Constitution. Const 1963, art 1, § 20; *People v Nunley*, 491 Mich 686, 697; 821 NW2d 642 (2012).

The United States Supreme Court has held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination." *Crawford*, 541 US at 53-54. In *Crawford*, the Supreme Court explained that the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' " *Id*. at 51 (citation omitted). The *Crawford* Court further explained that " 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id*. (quotation marks and citation omitted; alteration in original). The United States Supreme Court later explained that a "critical portion" of its holding in *Crawford* was "the phrase 'testimonial statements' " and that "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v Washington*, 547 US 813, 821; 126 S Ct 2266; 165 L Ed 2d 224 (2006), citing *Crawford*, 541 US at 51.

In this case, defendant's appellate argument is premised on the assertion made in his brief that "it is clear that Antonio Stevenson, a non-testifying co-defendant, made a statement in which he said that [defendant] was at the scene of the crime and that [defendant] had indeed killed Baynham." However, there is no such statement by Stevenson that was actually introduced into evidence at trial, primarily because defense counsel successfully objected on hearsay grounds to the introduction of any statements of that nature as soon as the prosecutor's questioning appeared to be inevitably traveling down that path. At most, the only statement of Stevenson's that actually made it into evidence before defense counsel objected was Evans's testimony that "I told [defendant] I went to the preliminary hearing, and that Antonio Stevenson had said that he was." Defense counsel's objection cut Evans off before she could add to that statement.

Thus, defendant's appellate Confrontation Clause challenge rests entirely on speculation about what could potentially be inferred about what Stevenson *might* have said, as well as the assumption that because we can imagine a damaging form of statement by Stevenson, this is the same as having actually admitted such a statement into evidence at trial. Indeed, defendant admits as much on appeal, explicitly referring in his brief to the alleged "testimonial statements" of Stevenson on which his Confrontation Clause argument is premised as statements that were "*implied* by the witnesses Evans and Crosby" (emphasis added). We acknowledge that it is plausible that Stevenson may have made a statement similar in nature to the one proposed by defendant in his appellate brief or otherwise implicating defendant in the murder in some fashion. But the fact remains that the trial record does not inform us and, most importantly, did not inform the jury what Stevenson actually said. Because no testimonial *statement* by Stevenson was admitted into evidence at trial, defendant has not demonstrated that a Confrontation Clause violation constituting a clear or obvious error occurred. *Crawford*, 541 US at 53-54; *Davis*, 547 US at 821.

A different conclusion is not compelled by the fact that the prosecutor stated during rebuttal argument that "Stevenson talked." We reiterate that there was no actual statement by Stevenson introduced into evidence. The prosecutor's statement cited by defendant was brief and vague, and it did not constitute a statement by Stevenson. Moreover, the jury was instructed

that statements, arguments, and commentary by the lawyers are not evidence. It is well established that jurors are presumed to follow their instructions.[5] *People v Bruner*, 501 Mich 220, 228; 912 NW2d 514 (2018).

Additionally, even if Evans's testimony that immediately preceded defense counsel's hearsay objection could be understood to have constituted the admission into evidence of a testimonial statement by Stevenson,[6] defendant has not demonstrated any prejudice. Considering this testimony—in which Evans testified that she told defendant that she went to the preliminary examination and Stevenson "said that he was"—within the context of Evans's answers to the prosecutor's preceding questions, the testimony could be understood at most to indicate that Stevenson said defendant was present when the home invasion and murder occurred. However, defendant's own statements conceding that he was present during the incident were also admitted at trial. Moreover, defendant's statements also indicated that he was more than merely present; he was actually involved in the incident regardless of defendant's attempts to minimize his involvement and to offer excuses and justifications for his involvement. Therefore, defendant has not shown that any statement by Stevenson that could potentially be understood to have come into evidence at trial caused any prejudice by affecting the outcome of the trial.[7] *Carines*,

---

[5] We are cognizant that a "narrow exception" exists in "when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v Marsh*, 481 US 200, 207; 107 S Ct 1702; 95 L Ed 2d 176 (1987). However, this exception is inapplicable in the instant case where no confession or statement of any discernable substance was introduced into evidence.

[6] We note that on this record, we do not know the context in which the statement allegedly made by Stevenson was made and therefore cannot discern whether such a statement was even testimonial. See *Crawford*, 541 US at 51 (stating that "not all hearsay implicates the Sixth Amendment's core concerns" and that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not"). Nonetheless, assuming without deciding that the statement would have constituted a testimonial statement, defendant has still not shown that he was prejudiced by it for the reasons explained above.

[7] We further note that even if we operated under the assumption that a statement by Stevenson implicating defendant in the murder was actually admitted at trial through inference, we would conclude that defendant failed to demonstrate plain error requiring reversal because he has not demonstrated any prejudice. In *People v Henry (After Remand)*, 305 Mich App 127, 154; 854 NW2d 114 (2014), this Court concluded that a detective's testimony about what a confidential informant had said constituted the admission of a testimonial statement that violated that the Confrontation Clause where there had been no prior opportunity for the defendant to cross-examine the informant. We reasoned that the testimony "was not limited to show why [the detective] proceeded in a certain direction with his investigation" but instead "necessarily implied that the informant accused defendant of the first two robberies and that [the detective considered the informant credible." *Id*. We further reasoned that the statements were testimonial because their primary purpose was to prove past events that were potentially relevant to a future

460 Mich at 763. Without a showing of prejudice, defendant cannot satisfy the requirements of the plain-error test.

Accordingly, for all of the above reasons, defendant has failed to establish plain error requiring reversal on the basis of an alleged Confrontation Clause violation.

## B. EFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant raises multiple claims of ineffective assistance of counsel.

Whether a defendant has been denied the effective assistance of counsel is a mixed question of law and fact. *People v Riley*, 468 Mich 135, 139; 659 NW2d 611 (2003). "We review factual findings for clear error, but we review de novo questions of constitutional law." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). However, no *Ginther*[8] hearing was conducted in this matter,[9] and therefore, "our review of the relevant facts is limited to mistakes apparent on the record." *Riley*, 468 Mich at 139.

---

criminal prosecution. *Id*. Nonetheless, we held that the defendant failed to show prejudice on plain-error review because there was "significant evidence that would allow a juror to convict defendant," which included testimony by victims identifying the defendant as the perpetrator, evidence of the perpetrator's use of the same modus operandi in committing the robberies, and evidence tying defendant to clothing similar to that worn by the perpetrator of the robberies. *Id*. at 155.

As an initial matter, we find *Henry* to be distinguishable from the instant case because the testimony at issue here was not as pervasive or detailed with respect to any statements by Stevenson as the testimony was in *Henry* regarding the statements of the confidential informant. Regardless, we find that defendant has not shown prejudice in the instant case from any statements allegedly made by Stevenson and admitted in violation of the Confrontation Clause. We reach this conclusion on the basis of the entire record, which includes, among other things, statements by defendant describing his role in the events leading to the murder as well as his text message to Baynham's girlfriend asking if people knew that defendant "did it." There was also evidence that defendant and Stevens were outside Baynham's house before the murder; that his truck was still parked outside Baynham's house when Baynham was dropped off by Perkins and Watkins on the day of the murder; that Stevens was found in possession of Baynham's Camaro after the murder; that a flat screen television was missing from Baynham's house; and that defendant was seen shortly after the murder by Ellis, someone with whom defendant lived, carrying a flat screen television that Ellis had not seen previously. Based on the record evidence, a reasonable juror could conclude that defendant was present and participated in the home invasion and murder.

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[9] This Court previously denied defendant's motion to remand for purposes of a *Ginther* hearing because defendant "fail[ed] to persuade the Court of the necessity of a remand at this time."

To successfully claim that a conviction must be reversed on the basis of ineffective assistance of counsel, a defendant must make two showings: (1) that counsel's performance was deficient, meaning that counsel performed below an objective standard of reasonableness under prevailing professional norms; and (2) that the deficient performance was prejudicial to the defense, meaning that there must be a reasonable probability that the result of the proceeding would have been different had it not been for counsel's unprofessional errors. *Strickland v Washington*, 466 US 668, 687-688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see also *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). In order to establish the deficient performance prong, "the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *Riley*, 468 Mich at 140; see also *Strickland*, 466 US at 689-690. Regarding the prejudice prong, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id*. at 700.

## 1. CONFRONTATION CLAUSE

First, with respect to the alleged Confrontation Clause violation that we have already examined, defendant argues in the alternative that he received ineffective assistance of counsel because defense counsel did not object on Confrontation Clause grounds to the admission of Stevenson's statements. In making this argument, defendant relies on the same portions of the trial record cited above.

However, as previously discussed, defense counsel successfully prevented Stevenson's statements from being admitted in to evidence by objecting on hearsay grounds. Therefore, defendant cannot show that defense counsel's performance in this respect was not sound trial strategy or otherwise below an objecting standard of reasonableness. *Strickland*, 466 US at 687-688, 689-690; *Riley*, 468 Mich at 140. Regarding the prosecutor's rebuttal argument statement, the statement was brief and vague, and it also did not disclose the substance of any statement made by Stevenson. "[T]here are times when it is better not to object and draw attention to an improper comment," especially during closing arguments; this decision often can be consistent with sound trial strategy. *Unger*, 278 Mich App at 242 (quotation marks and citation omitted). "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *Id*. at 242-243. Moreover, defendant's own statements that were admitted into evidence established defendant's presence and involvement during the crimes; these statements were much more damaging to the defense than the bare notion that Stevenson may have made statements casting blame on defendant. Defendant's own statements were also much more damaging than any statement by Stevenson that defendant was present, even assuming such a statement could be considered to have been admitted at trial. Defendant therefore has not established the prejudice prong either because he has not shown that but for the alleged error, the outcome of his trial would have been different.

---

*People v Bowman*, unpublished order of the Court of Appeals, entered May 10, 2018 (Docket No. 339086).

*Strickland*, 466 US at 694. In accordance with the above analysis, defendant has not shown that he received ineffective assistance of counsel based on his Confrontation Clause arguments because defendant has not demonstrated that defense counsel performed deficiently or that defendant suffered any prejudice based on this alleged error. *Id*. at 700.

On a related note, defendant argues that defense counsel was ineffective for failing to move for a mistrial on the basis of Stevenson's statements being admitted into evidence. In this case, Stevenson's statements were not admitted, and defendant again relies on what could be implied or inferred from the trial testimony about what Stevenson may have said. As we have already explained, defendant has not demonstrated that any prejudicial error occurred regarding statements by Stevenson. Therefore, defendant has not shown that he was entitled to a mistrial on this ground. *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667, 674 (2003) ("A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant . . . and impairs his ability to get a fair trial.") (quotation marks and citation omitted; ellipsis in original). "Counsel is not ineffective for failing to advance a meritless position or make a futile motion." *People v Henry (After Remand)*, 305 Mich App 127, 141; 854 NW2d 114 (2014).

## 2. MOTION TO STRIKE

Next, defendant argues that his trial counsel was constitutionally ineffective for failing to move for evidence that had been ruled inadmissible to be stricken from the record. After making this broadly framed general argument, defendant only specifically cites the references to Stevenson's statement as an example of trial counsel's alleged error in this respect. The substance of any statement by Stevenson was not disclosed to the jury because of defense counsel's immediate hearsay objections, which were sustained by the trial court. As a result, any references to statements by Stevenson were brief and vague. Trial counsel could have reasonably determined that further emphasis on these statements by seeking to have the jury specifically instructed not to consider them would have only served to highlight their potentially damaging nature. It can be an effecting trial strategy to refrain from objecting under such circumstances. See *Unger*, 278 Mich App at 242. Moreover, to the extent that it could be inferred that Stevenson stated that defendant was present and involved in the crimes, there was significant additional evidence supporting such an inference, making any reference to a statement by Stevenson to that effect cumulative. We thus conclude, with respect to trial counsel's decision not to move to strike this testimony, that defendant has not overcome the strong presumption that trial counsel employed sound trial strategy or shown that he suffered prejudice.[10] *Strickland*, 466 US at 700.

---

[10] Because defendant has not directed our attention to any other specific evidence that he believes should have been subjected to a motion to strike, had has abandoned any further challenges on this ground. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). An issue is abandoned if an appellant "fail[s] to properly

### 3. HEARSAY

Next, defendant argues that he received ineffective assistance of counsel because his trial counsel failed to object on hearsay grounds to (1) testimony by Cok that Baynham had told her that he had had some problems with defendant; (2) Perkins's testimony that Baynham had indicated at some point during the trip to Romulus that he had "left his main door open" and was not "prepared to just leave"; and (3) Detective Mark Burke's testimony, given in response to a juror's question, that he had stopped a truck driven by defendant because he had "received information" that defendant "was a homicide suspect."[11]

"Hearsay" is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is not admissible except as provided by our rules of evidence. MRE 802.

With respect to the testimony of Baynham's sister, Cok, she testified that Baynham had informed her about his problems with defendant but also testified from her own independent knowledge of the dispute between Baynham and defendant, which was based on her observations and familiarity with both Baynham and defendant. Cok explained that she and Baynham were both friends with defendant. Cok testified that she knew that Baynham "had a beef" with defendant, and she also testified that there was a period of time where Baynham and defendant were not speaking to each other. Consequently, even a successful hearsay objection would have served no practical purpose because the jury would still have learned about the existence of this tension between Baynham and defendant, which demonstrates the cumulative nature of the challenged testimony. For that reason, it was a reasonable strategic decision under the circumstances for counsel to decline to raise an objection, *Unger*, 278 Mich App at 242-243, and defendant has not shown a reasonable probability that the outcome would have been different but for the admission of this testimony, *Strickland*, 466 US at 694.

There were, likewise, valid strategic reasons that support counsel's decision not to object to Perkins's disputed testimony. Defendant's theory of the case was, in large part, that he did not commit second-degree home invasion, and thus also did not commit or aid or abet felony murder, because he and Stevenson had tacit permission to enter Baynham's home while he was

---

address the merits of his assertion of error." *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004).

[11] Defendant also contends, as an additional basis for this particular ineffective assistance of counsel claim, that his trial counsel failed to object on hearsay grounds to Crosby's testimony that he spoke to Stevenson and that defendant was subsequently considered a second suspect. However, this argument is factually contradicted by the record. As can be seen from the portion of Crosby's testimony quoted earlier in this opinion, defense counsel did, in fact, object to this testimony on hearsay grounds. The trial court issued its ruling, and the prosecutor continued questioning Crosby in compliance with that ruling. Thus, there is no factual basis for defendant's ineffective assistance of counsel claim with respect to this testimony. We further note that defendant does not challenge the trial court's hearsay ruling on appeal.

gone. That defense theory was supported, not undercut, by Perkins's contested testimony; defense counsel even made use of this testimony in closing argument to support the defense theory. In other words, Perkins's disputed testimony was seemingly more beneficial to the defense than the prosecution. Defendant's cursory appellate assertion that there "was no reasonable trial strategy for allowing this testimony in without objection" is insufficient to overcome the strong presumption that trial counsel employed a sound trial strategy. *Strickland*, 466 US at 689-690; *Riley*, 468 Mich at 140. "The fact that the strategy chosen by defense counsel did not work does not constitute ineffective assistance of counsel." *People v Williams*, 240 Mich App 316, 332; 614 NW2d 647 (2000). Furthermore, considering that this evidence was more helpful than harmful to the defense, defendant has not demonstrated any prejudice flowing from this testimony. Although defendant asserts on appeal that this testimony undermined his defense, defendant has not provided any further explanation of this contention. We therefore also conclude that this argument is abandoned. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). "An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004).

Similarly, with respect to Burke's challenged testimony, defendant has also failed to overcome the presumption that his trial counsel employed sound strategy by declining to object. Burke testified that he stopped a black pickup truck driven by defendant at approximately 12:25 a.m. on June 17, 2016. When he asked defendant for his name, defendant provided a false name. Burke was directed to release defendant at this point. After this testimony, Burke was presented with a question from the jury:

> *The Court*: "Why was the black truck stopped by the police?"
>
> [*Burke*]: I received information that the defendant, Mr. Bowman, was driving, and he was a homicide suspect. He was followed, surveilled by undercover units from a party store to the location where I was able to catch up with him.

This challenged testimony was not elicited by the prosecution; rather, it was Burke's response to a juror-posed question. There was no indication from the phrasing of the question that it would necessarily elicit hearsay, so defense counsel had no reason to object before the question was asked. Once the answer was given, defense counsel might reasonably have been hesitant to object to it out of concern that an objection might be viewed negatively by the jury. Defense counsel may have also determined that it was better to refrain from objecting so such a brief and relatively inconsequential answer at that point, rather than drawing further attention to it; this was a reasonable trial strategy. See *Unger*, 278 Mich App at 242. Defendant has not overcome the presumption that counsel's performance constituted sound trial strategy. *Strickland*, 466 US at 689-690; *Riley*, 468 Mich at 140. Moreover, defendant has not explained how he was prejudiced by the information that defendant, at some point, had been considered by the police to be a homicide suspect. The jury was instructed that the fact that defendant was charged with a crime and was on trial is not evidence. Jurors are presumed to follow their instructions. *Bruner*, 501 Mich at 228.

-15-

Defendant has not shown that he received ineffective assistance of counsel on the basis that defense counsel did not object to the above testimony on hearsay grounds.[12]

### 4. MISSING WITNESS

Next, defendant argues that trial counsel performed ineffectively by failing "to secure the appearance of" Mildred Brown as a defense witness.

On the last day of trial, after the prosecution had rested, Brown was not present and defense counsel informed the trial court about his efforts to secure Brown's presence to testify on behalf of the defense at trial. Counsel indicated that he had contacted Brown in advance of trial, served her with a subpoena, notified her of an adjournment of the second trial that affected the date for her planned testimony, telephoned her five times during the course of the second trial that is the subject of this appeal (three times on the morning that she was to testify and twice the previous evening), left voicemail messages, and searched the courthouse for her. Although defense counsel had apparently been successful in contacting Brown before the second trial, she did not respond to his attempts to contact her during the course of the second trial.

When the trial court offered to send the police "to go pick her up with a witness detainer," defense counsel declined. His "main reason" for doing so, he explained, was concern that such a course of action would result in Brown becoming a hostile witness to the defense. Defense counsel evidently had another reason for declining to resort to this method of securing Brown's presence, but counsel stated, "I won't go into the other reason[.]" Defense counsel finally stated with respect to having Brown brought to the courtroom to testify, "And I just don't think it would be beneficial to our case to go that route."

Instead, counsel asked the trial court to declare Brown an unavailable witness and permit Brown's testimony from the first trial to be read into the record. The trial court refused, reasoning that it could not hold that Brown was "unavailable" given that defense counsel refused to compel her attendance and that the court did not have any information about whether defense counsel had attempted to contact Brown between the adjournment of the second trial and the night before the last day of trial.

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *Id.* at 76-77.

---

[12] Defendant also argues that defense counsel was ineffective for objecting to the above testimony by Burke because it was irrelevant and highly prejudicial. However, defendant has not established ineffective assistance of counsel on this ground for the same reasons that we concluded above that he did not demonstrate ineffective assistance with respect to this testimony on hearsay grounds.

-16-

In this case, the record supports the conclusion that defense counsel declined to call Brown as a witness at trial because he feared that she would damage the defense case more than she would help it. It seems that defense counsel was willing to present her earlier testimony—which was a known quantity—if he could get it admitted, but did not want to run the risk of harming his case by ensuring Brown's live testimony during which anything could happen.

On appeal, defendant does not cite any record evidence or provide any argument or insight to give this Court reason to doubt that the concerns of defendant's trial counsel were well-founded. Instead, defendant merely argues that Brown's testimony would have contradicted the testimony of Perkins, Watkins, and Crosby and that "if the jury had chosen not to believe the testimony of Ms. Evans, there would have been no narrative given of how the killing occurred." This argument relies, at its core, solely on speculation about what would have happened if the jury had not believed Evans even though defendant does not provide any explanation of how Brown's testimony would have impeached the testimony of Evans. Defendant maintains on appeal that Brown's testimony would have been helpful because she would have testified that she lived behind Baynham's house, that she saw seven or eight people outside Baynham's house at 2:00 a.m. on the morning in question, and that she had told Crosby that he could contact her security company to review recordings from the video cameras on her house. However, to the extent that such testimony would have created any factual questions for the jury, the resolution of those questions would not have been material or had any impact on the determination of the issues that were central to the case, which involved questions surrounding whether *defendant* was involved in breaking and entering Baynham's home, stealing Baynham's property, and causing Baynham's shooting death. Defendant does not claim that any video evidence that would exonerate him actually exists, and the presence of more people outside Baynham's house at 2:00 a.m. does not have any impact on whether *defendant* was one of the people involved in a home invasion and murder that occurred hours later.

Therefore, defendant has failed to overcome the presumption that defense counsel employed sound trial strategy by deciding not to call Brown as a witness, *id*., and defendant has not demonstrated a reasonable probability that the outcome of his trial would have been different had Brown testified, *Strickland*, 466 U.S. at 694.

### 5. "CONCESSION" OF AN ELEMENT DURING CLOSING ARGUMENT

Next, defendant argues that his trial counsel rendered constitutionally ineffective assistance of counsel by "conceding" the larceny element of the second-degree home invasion charge during closing argument, which was also the underlying felony for purposes of the felony-murder charge. However, the premise of defendant's argument is not factually supported by the record because defense counsel never conceded the larceny element of second-degree home invasion in making his closing argument to the jury. While defense counsel conceded that defendant was *present*, counsel argued forcefully that defendant went into Baynham's house with permission in an attempt to negate the breaking and entering element of second-degree home invasion.[13] "The fact that the strategy chosen by defense counsel did not work does not

---

[13] MCL 750.110a(3) provides:

-17-

constitute ineffective assistance of counsel." *Williams*, 240 Mich App at 332. Because defendant's claim of error is directly contradicted by the record facts, defendant cannot demonstrate that she received ineffective assistance of counsel on this ground. Moreover, even if defense counsel had conceded the larceny element in favor of focusing his arguments on other matters that he believed were more likely to succeed,[14] it can be a legitimate trial strategy to concede "certain elements of the charge at trial." *People v Chapo*, 283 Mich App 360, 369-370; 770 NW2d 68 (2009).

## 6. "OTHER ACTS" EVIDENCE

Next, defendant argues that trial counsel was ineffective for failing to object under MRE 404(b)(1)[15] to the testimony that defendant "stole" Watkins's cell phone while Perkins and Watkins were at Baynham's house on the night of the events leading up to Baynham's death. However, in arguing that defense counsel should have sought to prevent this evidence from being admitted at trial, defendant on appeal fails to acknowledge that defense counsel actually used the evidence of this cell phone incident to the advantage of the defense: during closing

---

> A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the second degree.

[14] We note that although defendant's appellate argument focuses on whether it could have been shown that defendant did not commit a larceny on the basis of his claim that he planned to leave money for the narcotics he planned to take, defendant's appellate argument nonetheless ignores the evidence showing that a flat-screen television was missing from Baynham's house and defendant was seen shortly after the murder with a flat-screen television that he did not previously have. "[A]t common law simple larceny was defined as the felonious taking, and carrying away, of the personal goods of another." *People v March*, 499 Mich 389, 401; 886 NW2d 396 (2016) (quotation marks and citation omitted; alteration in original). "There is no statutory definition of larceny in Michigan and all statutes use the term in its common-law sense." *Id*. at 399-400 (quotation marks and citation omitted).

[15] MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

argument, defense counsel essentially tried to discredit Perkins as a witness by describing how angry she became at defendant over the cell phone, even though Watkins was apparently not as upset, and arguing that Perkins was an "anger-driven, alcohol-fueled woman who's really mad about the situation with this cell phone" and wanted defendant and Stevenson "gone." The record reflects that this was not a mere spontaneous argument on the part of defense counsel or an attempt to make the best of a less-than-ideal situation because defense counsel cross-examined both Perkins and Watkins about the factual circumstances of this cell phone incident and the angry reaction it caused in Perkins.

Defendant has not made any attempt on appeal to argue how the strategy chosen by defense counsel in this respect was below an objective standard of reasonableness, and we discern no reason to conclude that it was objectively unreasonable to adopt a strategy of trying to show why an important prosecution witness may have had a motive to wrongly accuse defendant of criminal activity. In setting forth the standards for courts to use when analyzing the performance prong of the ineffective assistance of counsel test, the United States Supreme Court gave the following explanation, which is especially pertinent in addressing the type of argument put forth by defendant in this case:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.
>
> Judicial scrutiny of counsel's performance must be highly deferential. *It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.* Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.*

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. [*Strickland*, 466 US at 688-690 (citations omitted; emphasis added).]

In this case, defendant's appellate argument is simply that defendant's trial counsel should have employed a different trial strategy regarding this evidence, and defendant has not demonstrated that the strategy actually used was objectively unreasonable. The fact that defense counsel's strategy did not prevent defendant's conviction does not make it an unreasonable strategy, and arguments aimed solely at second-guessing trial strategy with the benefit of hindsight do not properly address the applicable standards for making an ineffective assistance of counsel claim. See *id*. Defendant has not overcome the strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" with respect to this issue. *Id*. at 690.

## 7. REDACTION OF JAIL CALLS

Next, defendant argues that defense counsel was ineffective by failing to request redaction of "irrelevant, highly prejudicial portions" of jail call recordings involving defendant that were played for the jury at trial. Defendant points out that these recordings were full of profanity and that one of the individuals speaking to defendant made several threats of physical violence directed toward children.

Assuming without deciding that defense counsel could have successfully moved to have the jail calls redacted to prevent the jury from hearing these statements, we are convinced based on our review of the recordings that it is not reasonable to believe that the jury's decision to convict defendant of the serious crimes at issue in this case, which include felony-murder and

second-degree home invasion, on the basis of these statements made by an unknown individual or by defendant's use of profanity. Defendant has not shown that there exists a reasonable probability, which would affect our confidence in the outcome, that the result of the trial would have been different if the jail calls had been redacted. *Strickland*, 466 US at 694.

## 8. CROSS-EXAMINATION OF EXPERT WITNESS

Next, defendant argues that his trial counsel was ineffective by failing to "adequately" cross-examine one of the prosecution's witnesses, Stan Brue, who testified as an expert in the forensic analysis of cell tower records and mapping. Specifically, defendant contends on appeal that his trial counsel should have asked Brue on cross-examination about Brue's methodology for determining that certain cell phone numbers were "associated with" defendant and Baynham, as well as how Brue determined that the name "Giovanni Bossman" was the name associated with a telephone number that had been called several times by a cell phone number associated with defendant.

However, defendant has not provided any indication that such questions would have elicited testimony helpful to the defense. Instead, defendant constructs an argument for why he believes his trial counsel should have asked these questions that is based on purely speculative assumptions of fact that are unsupported by *any* record evidence. Additionally, there is no evidence that Brue's methodology was unsound or that the telephone numbers in question were not actually associated with the respective individuals.

There is no basis for an appellate court to grant relief on an ineffective assistance of counsel claim where there is no record evidence to support it. *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973). A defendant challenging his conviction on the basis that he received ineffective assistance of counsel bears the burden of proving his claim. *Id*. at 442-443. "To the extent his claim depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court level in connection with a motion for a new trial which evidentially supports his claim and which excludes reasonable hypotheses consistent with the view that his trial lawyer represented him adequately." *Id*. at 443 (quotation marks and citation omitted).

In this case, although we previously denied defendant's motion to remand for a *Ginther* hearing, defendant's speculative arguments do not demonstrate that defendant is entitled to a *Ginther* hearing for the purposes of exploring whether any of his hypotheses might be true. Defendant has not provided this Court with any affidavits or an offer of proof serving to demonstrate the actual existence of an issue requiring further factual development that would advance his claim, and he therefore has not persuaded us that remand for a *Ginther* hearing is necessary. *Chapo*, 283 Mich App at 368-369; MCR 7.211(C)(1)(a)(ii). Mere conjecture is insufficient to warrant a *Ginther* hearing. See *Ginther*, 390 Mich at 442 (indicating that an evidentiary hearing is only necessary "if there is a factual dispute"); MCR 7.211(C)(1) (requiring a motion to remand to be "supported by affidavit or offer of proof regarding the facts to be established at a hearing"). Defendant has failed on appeal to overcome the presumption that defense counsel employed effective trial strategy in his decisions regarding how to question this witness. *Rockey*, 237 Mich App at 76-77.

## 9. IRRELEVANT TESTIMONY GIVEN BY CROSBY

Finally, defendant argues that trial counsel performed ineffectively by failing to object to portions of Crosby's testimony relating to his investigation of defendant. Defendant contends that this evidence was inadmissible under MRE 402 (providing that only relevant evidence is admissible), and MRE 403 (allowing the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice" or other enumerated concerns).

Assuming without deciding that defense counsel could have successfully prevented any of this challenged evidence[16] from coming in at trial by making a timely objection, defendant simply asserts on appeal that this evidence "prejudiced" defendant. The testimony cited by defendant involved brief, vague statements by Crosby involving Stevenson's arrest, locating phone numbers for defendant, surveillance conducted on defendant, and the fact that Stevenson and defendant's family members made statements. The substance of these statements was not repeated by Crosby. In light of all of the trial evidence, including defendant's own detailed statements implicating himself in the crimes, defendant has not demonstrated that there exists a reasonable probability that the trial outcome would have been different but for the admission of this testimony.[17] *Strickland*, 466 US at 694.

## C. MISCHARACTERIZATION OF TESTIMONY

Next, defendant argues that the trial court erred in its ruling on defense counsel's objection during the prosecutor's closing rebuttal argument in which defense counsel claimed that the prosecutor was mischaracterizing the testimony.

---

[16] While some of the evidence cited by defendant admittedly appears to be irrelevant, we do not believe all of it is. For example, the evidence that Stevenson was found in possession of Baynham's Camaro was highly relevant, highly probative, and not *unfairly* prejudicial. MRE 402; MRE 403. This evidence tended to show that Stevenson took Baynham's car after Baynham was killed. When coupled with the evidence that defendant was seen with Stevenson during the early morning hours of June 15, 2016, and that defendant's truck was parked outside Baynham's house when Baynham was dropped off that morning by Perkins and Watkins, this evidence further tended to support the conclusion that defendant was involved in the crimes.

[17] We additionally note that we discern no prejudice that affected the outcome of the trial flowing from Crosby's testimony that defendant "had a prior record, so we were able to get another number through the MDOC and develop that phone number." See *Strickland*, 466 US at 691-692 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.") (citation omitted). Crosby did not testify about the number of prior convictions defendant had or the offenses he had apparently committed, and defendant stipulated at trial to the fact that he had previously been convicted of a felony.

During rebuttal, the prosecutor stated:

> And who came out of the home after the murder? Who came out of the home with the phone? Was it Stevenson? No. The defendant, Mr. Baynham's phone, he got it out of the pocket.

Defense counsel objected, "That's actually a total mischaracterization of the testimony." After holding a brief sidebar discussion with the attorneys off the record, the trial court overruled the objection and further stated, "It's up to the jury to determine what the testimony was." The jury was present for this ruling.

On appeal, defendant argues that the trial court's ruling was erroneous and that the judge should have told the jury what the testimony was. Although we initially note that defendant has abandoned this argument by failing to cite any legal authority in support of his argument, *Kelly*, 231 Mich App at 640-641, defendant is incorrect in any event. It is well settled that "[i]t is the province of the jury to determine questions of fact and assess the credibility of witnesses." *People v Lemmon*, 456 Mich 625, 636-637; 576 NW2d 129 (1998).

Furthermore, the trial court's response was consistent with M Crim JI 3.1(3), which states as follows:

> As jurors, you must decide what the facts of this case are. This is your job, and nobody else's. You must think about all the evidence and then decide what each piece of evidence means and how important you think it is. This includes whether you believe what each of the witnesses said. What you decide about any fact in this case is final.

The trial court's response was also consistent with M Crim JI 3.5, which states in pertinent part as follows:

> (1) When you discuss the case and decide on your verdict, you may only consider the evidence that has been properly admitted in this case. Therefore, it is important for you to understand what is evidence and what is not evidence.
>
> (2) Evidence includes only the sworn testimony of witnesses [, the exhibits admitted into evidence, and anything else I told you to consider as evidence].
>
> * * *
>
> (5) The lawyers' statements and arguments [and any commentary] are not evidence. They are only meant to help you understand the evidence and each side's legal theories. *You should only accept things the lawyers say that are supported by the evidence* or by your own common sense and general knowledge. The lawyers' questions to the witnesses [, your questions to the witnesses,] and my questions to the witnesses are also not evidence. You should consider these questions only as they give meaning to the witnesses' answers.

(6) My comments, rulings, questions, [summary of the evidence,] and instructions are also not evidence. It is my duty to see that the trial is conducted according to the law, and to tell you the law that applies to this case. However, when I make a comment or give an instruction, I am not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the only judges of the facts, and you should decide this case from the evidence. [Emphasis added; bracketed material in original.]

The trial court also gave these same specific instructions to the jury as part of the final jury instructions. Based on the cited portion of the prosecutor's rebuttal and defense counsel's objection in reaction to it, it appears that the prosecutor and defense counsel had different recollections about the substance of the evidence that had been presented on this particular point. The trial court, in responding to defense counsel's objection, properly informed the jury that it was the task of the jury to resolve this factual dispute by considering that which was the actual evidence—the sworn testimony—rather than that which was *not* evidence—i.e., the lawyers' statements or, as defendant proposes on appeal, a clarification by the trial judge. The trial court did not err by instructing the jury that the jury was responsible for determining what the testimony was.

## D. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecutor committed "numerous instances of prosecutorial misconduct," denying him his rights to due process and a fair trial.

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64. Review of preserved allegations of prosecutorial misconduct is de novo. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003). However, "[r]eview of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *Unger*, 278 Mich App at 234-235 (quotation marks and citation omitted). We review unpreserved claims of prosecutorial misconduct for plain error affecting substantial rights. *Ackerman*, 257 Mich App at 448. "[W]e cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Unger*, 278 Mich App at 235 (quotation marks and citations omitted). Indeed, "[c]urative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id.* (citations omitted).

In this case, defendant raises five claims of prosecutorial misconduct. First, defendant argues that the prosecutor committed misconduct by "mischaracterizing testimony and arguing facts not in evidence" during rebuttal arguments. This claim rests on the same portion of the prosecutor's argument quoted above in Part II(C) of this opinion. While it appears that the prosecutor's statement conflicted with Evans's testimony about what defendant had said about who removed the cell phone from Baynham's pocket, the prosecutor's statement that defendant

had Baynham's cell phone when defendant left the house was consistent with Evans's testimony. It seems that the prosecutor incorrectly recalled the substance of the testimony in this relatively minor respect. Nonetheless, defense counsel objected and the trial court instructed the jury that it was the jury's task to determine what the testimony was. As we explained previously, this instruction was proper. Therefore, any potential prejudicial effect was extinguished by this curative instruction, *Unger*, 278 Mich App at 235, and defendant has not shown that he was denied a fair and impartial trial as a result of this remark, *Dobek*, 274 Mich App at 63-64.

Next, defendant argues that the prosecutor engaged in misconduct by "repeatedly violat[ing] the court's hearsay order regarding evidence of a non-testifying co-defendant's custodial statement implicating [defendant] during examination and closing argument . . . ." Defendant apparently relies on the same portions of the record referring to statements allegedly made by Stevenson that we have already discussed in the context of defendant's Confrontation Clause and ineffective assistance of counsel claims. As we have already explained, no evidence was admitted at trial of the substance of any statement allegedly made by Stevenson. Defense counsel, while successfully preventing such statements from being admitted by objecting on hearsay grounds, never requested any type of curative instruction. Any potential for prejudice that remained after defense counsel's successful objections or that could be tied to the prosecutor's brief rebuttal statement that "Stevenson talked" could have been cured by an appropriate instruction, which makes reversal on prosecutorial misconduct grounds unwarranted. *Unger*, 278 Mich App at 235.

Defendant next argues that the prosecutor engaged in further misconduct during rebuttal by (1) bolstering the testimony of Evans; (2) arguing facts not in evidence in stating that the call records showing defendant's cell phone calls during the early morning hours of June 15, 2016, demonstrated that defendant did not have any remorse and was telling Giovanni Bossman what had happened; and (3) that the prosecutor made an improper civic duty argument in presenting a hypothetical example that he claimed illustrated the rationale behind the aiding and abetting rule. Defendant did not object to any of these alleged instances of misconduct. We are convinced from our review of the record that none of these statements contain any potential for prejudicial effect that could not have been removed by a proper curative instruction, and defendant has therefore not established error requiring reversal based on these statements. *Unger*, 278 Mich App at 235.

## E. DOUBLE JEOPARDY

Defendant argues that the trial court clearly erred by denying defendant's motion to bar his retrial due to prosecutorial misconduct.

Defendant's first trial ended in a mistrial with respect to him,[18] due to issues surrounding a police officer's testimony about a search that was conducted of defendant's home and the

---

[18] At the first trial, defendant was tried jointly with Stevenson. Defendant and Stevenson had separate juries. The trial continued with respect to Stevenson.

prosecutor's failure to provide defendant with discovery material related to that search. Specifically, the prosecution presented police officer testimony regarding a search of defendant's home. After this testimony, defense counsel informed the trial court that he had not been provided with discovery material related to the search, including a copy of the warrant used to justify the search. The prosecutor was subsequently unable to actually produce a signed copy of this warrant. Defense counsel moved for a mistrial.

The prosecutor objected to the mistrial, arguing that he had previously shown defense counsel photographs of the evidence collected from the search (which were admitted into evidence during the officer's testimony), that he believed these photographs were in the discovery provided for defense counsel, and that defense counsel did not object to the introduction of these photographs into evidence during the police officer's testimony at trial. The prosecutor admitted that the search warrant had not been turned over to defense counsel and that the actual signed copy had not been located, but the prosecutor further argued that there was an activity log showing that a magistrate signed the warrant. The prosecutor also stated that he did not "think that [defense counsel was] being genuine . . . [by] saying that [he] had no notice and they didn't see the items." The prosecutor maintained that defense counsel should have objected before the challenged evidence was admitted at trial rather than waiting until the jury was presented with the evidence. Defense counsel argued that he was "blind-sided" by the evidence related to the search warrant, was not given the photographs of the evidence from the search, had not previously seen the photographs, and was confused and surprised when they were introduced into evidence.

Defendant indicated under oath that he consented to a mistrial and that he understood that he could be retried and that jeopardy would not attach. The trial court granted a mistrial with respect to defendant.

Before defendant's second trial commenced, defendant moved to bar retrial on Double Jeopardy Clause grounds, arguing that the prosecutor had intentionally "provoked" defendant's mistrial motion through repeated failures to provide timely discovery material. A motion hearing was held, and the trial court denied defendant's motion. The court ruled that it did not find the prosecutor's conduct in this case to have been intentional misconduct and that it was, at most, negligence or mistake.

On appeal, defendant argues that the prosecutor's failures with respect to providing timely discovery demonstrated an intent to provoke a mistrial, such that defendant was not constitutionally subject to being retried.

"A constitutional double jeopardy challenge presents a question of law that we review de novo." *People v Lett*, 466 Mich 206, 212; 644 NW2d 743 (2002). A trial court's related factual findings regarding whether the prosecution intended to "goad" the defense into moving for a mistrial are reviewed for clear error. *People v Dawson*, 431 Mich 234, 258; 427 NW2d 886 (1988). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Antwine*, 293 Mich App 192, 194; 809 NW2d 439 (2011) (quotation marks and citation omitted).

Both the Double Jeopardy Clause of the United States Constitution and the analogous provision of the Michigan Constitution prohibit an accused from being " 'twice put in jeopardy' for the same offense." *Lett*, 466 Mich at 213, citing US Const, Am V; Const 1963, art 1 § 15. "The Double Jeopardy Clause does not bar all retrials." *Dawson*, 431 Mich at 252. As specifically relevant here, "[w]here the motion for mistrial was made by defense counsel, or with his consent, and the mistrial was caused by innocent conduct of the prosecutor or judge, or by factors beyond their control, or by defense counsel himself, retrial is . . . generally allowed, on the premise that by making or consenting to the motion the defendant waives a double jeopardy claim." *Id*. at 253.

However, the United States Supreme Court has recognized that there this is a "narrow exception" to the general rule that the Double Jeopardy Clause does not bar the retrial of a defendant who moves for a mistrial. *Oregon v Kennedy*, 456 US 667, 673; 102 S Ct 2083; 72 L Ed 2d 416 (1982). In *Kennedy*, the Supreme Court held that when a criminal defendant successfully moves for a mistrial, "the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Id*. at 679. In other words, "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id*. at 676. Examining the prosecutor's intent requires the trial court to make a factual finding by "[i]nferring the existence or nonexistence of intent from objective facts and circumstances." *Id*. at 675. "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. *Id*. at 675-676.

In *Dawson*, our Supreme Court "adopt[ed] the federal standard and [held] that retrial is barred where the prosecutor intended to goad the defendant into moving for a mistrial." *Dawson*, 431 Mich at 236. The *Dawson* Court explained:

> Retrials are an exception to the general double jeopardy bar. Where a mistrial results from apparently innocent or even negligent prosecutorial error, or from factors beyond his control, the public interest in allowing a retrial outweighs the double jeopardy bar. The balance tilts, however, where the judge finds, on the basis of the "objective facts and circumstances of the particular case," that the prosecutor intended to goad the defendant into moving for a mistrial. [*Id*. at 257 (citation omitted).]

In this case, the objective facts and circumstances in the record do not support a conclusion that the trial court's finding was clearly erroneous. While the prosecutor's negligence with respect to handling discovery matters is evident from the record, there is nothing in the record that would objectively support an inference that the prosecutor harbored an intent to circumvent the protections of the Double Jeopardy Clause by provoking or goading defense counsel into moving for a mistrial. *Kennedy*, 456 US at 675-676. We are not left with a firm and definite conviction that the trial court made a mistake by finding that the prosecutor did not

intend to goad defendant into moving for a mistrial. Accordingly, there was no double jeopardy bar to retrying defendant. *Id*. at 679; *Dawson*, 431 Mich at 236, 257.

## F. "UNAVAILABLE" WITNESS

Defendant argues that the trial court erred by ruling that Brown was not an unavailable witness for purposes of allowing defendant to admit Brown's testimony from the first trial into evidence at the second trial.

Under MRE 804(b)(1), there is a hearsay exception for former testimony that may apply if, among other things, "the declarant is unavailable as a witness. The relevant definition of unavailability for purposes of the instant case is found in MRE 804(a)(5), which provides in pertinent part that a declarant is unavailable as a witness if the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown."

The test for unavailability under MRE 804(a)(5) is that the proponent "must have made a diligent good-faith effort in its attempt to locate a witness for trial." *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). "The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Id*. The trial court's determination will only be reversed if a "clear abuse of discretion" has been established on appeal. *Id*. "Preliminary questions of law, such as whether a rule of evidence, constitutional provision, or statute precludes the admission of the evidence, are reviewed de novo." *People v Jones*, 270 Mich App 208, 211; 714 NW2d 362 (2006).

In this case, defense counsel asked the trial court to declare Brown "unavailable" as a witness, despite having declined the trial court's offer to order police officers to pick Brown up with a witness detainer. Although defense counsel detailed his other attempts to contact Brown, he expressly chose not to take advantage of a powerful tool for obtaining Brown's attendance at trial. Under these circumstances, to choose not to even make an attempt to have the police compel Brown's attendance demonstrates that the test for unavailability under MRE 804(a)(5) was not satisfied. Defendant has not shown that the trial court erred in its ruling.

## G. JUDICIAL MISCONDUCT

Finally, defendant argues that the trial judge committed judicial misconduct by indicating to the jury at the close of the third day of trial that "we'll hear from defense witnesses in the morning," without being certain that defendant's witnesses would actually appear. Defendant's witness did not appear, and defendant did not testify. Defendant has not cited any legal authority to support his argument that this constitutes judicial misconduct and has therefore abandoned this issue on appeal. *Kelly*, 231 Mich App at 640-641.

In any event, it appears from defense counsel's representations to the trial court on the fourth day of trial, which defense counsel made in the context of asking to have Brown declared an unavailable witness that defense counsel had informed the trial court on the third day of trial that he planned to call Brown as a witness. Defense counsel was subsequently unable to contact

Brown before the morning of the fourth day of trial. We thus do not see how the judge's conduct could be considered to have "improperly influenced the jury by creating the appearance of advocacy or partiality against a party," such that the judge's conduct could be considered to have pierced the "veil of judicial impartiality" and denied defendant a fair trial. *People v Stevens*, 498 Mich 162, 170-171; 869 NW2d 233 (2015).

Affirmed.

/s/ Stephen L. Borrello
/s/ Brock A. Swartzle
/s/ Thomas C. Cameron